IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LEE M. SIMMONS, | ) | 8:13CV98 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| JONATHAN B. JARVIS, in his | ) | |
| official capacity as Director of the | ) | |
| National Park Service; SALLY | ) | |
| JEWELL, in her official capacity as | ) | |
| Secretary of the United States | ) | |
| Department of the Interior; and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The plaintiff, Lee M. Simmons ("Simmons"), owns land in Cherry County, Nebraska, a portion of which is included within the boundaries of the Niobrara National Scenic River. He brings this action to contest the boundary line that was drawn by the National Park Service ("NPS") in March 2007. Defendants include Jonathan B. Jarvis, Director of the National Park Service, Sally Jewell, Secretary of the U.S. Department of Interior, and the United States of America.

## I. BACKGROUND

### A. The Wild and Scenic Rivers Act

"The Wild and Scenic Rivers Act ('WSRA'), 16 U.S.C. §§ 1271-1287, was enacted in 1968 out of concern for the preservation of United States rivers, many of which had been subjected to overdevelopment and damming." *Friends of Yosemite Valley v. Kempthorne, 520 F.3d 1024, 1027 (9th Cir. 2008).* The WSRA codifies Congress's policy determination "that certain selected rivers of the Nation which, with

their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271.

"As originally enacted, the WSRA named specific rivers or segments of rivers for inclusion in the Wild and Scenic River System ('WSRS')." *Friends of Yosemite,* 520 F.3d at 1027 (citing 16 U.S.C. § 1274(a)(1)-(a)(8)). "The WSRA also sets forth a procedure for future designations to the WSRS." *Id.* (citing 16 U.S.C. § 1273(a)). "WSRS components are administered by the Secretary of the Interior (including any component administered by the Secretary of the Interior through the National Park Service or the Fish and Wildlife Service) or, if the river falls within a national forest, the Secretary of Agriculture." *Id.* (citing 16 U.S.C. § 1281(c)-(d)).

### B. Designation of Nebraska's Niobrara River as a National Scenic River

In 1991, Congress amended the WSRA to designate 76 miles of the Niobrara River in north-central Nebraska as a unit of the national Wild and Scenic Rivers System.  *See* Niobrara Scenic River Designation Act of 1991, Pub. L. No. 102-50, §§ 2-3, 105 Stat 254, codified at 16 U.S.C. §§ 1274(a)(117), 1276(a)(111). "The amendment did not specify which or how much land in the immediate environment of the Niobrara River was ultimately to be included within the Act's protections.[1] Instead, it directed the Secretary of the Interior, pursuant to 16 U.S.C. § 1274(b), to select detailed boundaries for protected land in the Niobrara River area, totaling no

---

[1] "On designation, however, provisional boundaries were immediately set at one-quarter mile from the sides of the river banks. 16 U.S.C. § 1275(d). Provisional boundaries remain in place until amended by the action of the administering agency." *Sokol v. Kennedy*, 210 F.3d 876, 877 (8th Cir. 2000).

more than 320 acres per river mile. The Secretary delegated this authority to the Park Service." *Sokol v. Kennedy*, 210 F.3d 876, 877 (8th Cir. 2000) (footnote omitted).

In 1992, the Park Service began the decision-making process to establish boundaries for the river area, and to generate the required General Management Plan and Environmental Impact Statement. This process was thorough and lengthy, lasting over four years. The Park Service formed a planning team, led by Natural Resource Specialist William Conrod, to gather and analyze information on the Niobrara River area from a wide variety of public and private sources. The planning team also developed its own information from personal observations and field studies of resources along the river. The planning team assembled a large amount of information that was used to create "resource maps." The team used these maps to develop boundary alternatives, seeking to maximize protection of various resources in the area. The Park Service also organized the Niobrara Scenic River Advisory Commission, a body of local residents, businessmen, environmental groups, and state officials, that contributed to the process and received public comment on the planned boundaries.

The Park Service did not evaluate the land adjacent to the Niobrara River in terms of "outstandingly remarkable" values. Instead, from the beginning, the planning team analyzed the Niobrara River area in terms of "significant" and "important" values. Park Service officials were more comfortable with the significance and importance standards because they were familiar with them from other regulatory contexts. Additionally, the planning team felt that the term, "outstandingly remarkable," was not clear and was relevant only to the selection of new rivers for inclusion in the Wild and Scenic Rivers System. Nevertheless, the planning team purported to adopt the outstandingly-remarkable-values standard retroactively after [an affected landowner,] Mr. [David] Sokol[,] complained, at the September 15, 1995, meeting of the Advisory Commission, that the significant-values standard violated the Act. The planning team's documents and field notes before Mr. Sokol's complaint spoke only in terms of significance or importance. Subsequently, the draft and final boundary alternatives, published by the team in 1996, explained that "significant" and "important" were being used merely as

synonyms for "outstandingly remarkable." By the end of the process, the Park Service claimed to have dropped the significant/important-values standard altogether, and the Park Service's final Record of Decision speaks only in terms of "outstandingly remarkable values."

*Id.* at 877-78.

### C. The Sokol Decision

In 1997, Mr. Sokol brought suit in this court (Case No. 8:97CV51) to challenge the boundaries set by NPS.[2] "He alleged that the Park Service had violated the Act by failing to apply an outstandingly-remarkable-values standard when selecting boundaries for the Niobrara Scenic River area. Defendants replied, first, that this standard did not apply because the Park Service had complete discretion under the Act to establish the boundaries as it saw fit. Second, they maintained that even if the outstandingly-remarkable-values standard was required, the Park Service had in fact used it." *Id.* at 878. This court granted summary judgment for the defendants, *see Sokol v. Kennedy*, 48 F.Supp.2d 911 (D.Neb. 1999) (Bataillon, J.), but the Court of Appeals reversed the decision and held that "the Park Service's boundary selection violated its statutory duty under the Act." 210 F.3d at 881. In particular, the Court held "[t]he Park Service failed to apply the relevant statutory authority in making its decision. It selected land for inclusion in the Niobrara Scenic River area without identifying and seeking to protect outstandingly remarkable values, as required by the Wild and Scenic Rivers Act." *Id.* at 878. The Court explained:

> We reject the defendants' first argument that the Park Service was free to select land for the river area as it saw fit, without regard for the outstandingly remarkable values that Congress sought to protect in the Niobrara. The defendants rely on 16 U.S.C. § 1274(b), pursuant to which

---

[2] The Park Service's action was reviewed under the Administrative Procedure Act for a determination of whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

-4-

Congress charged the Park Service to establish detailed boundaries. They argue that Section 1274(b) allows them complete discretion in choosing land, within the Section's acreage limitation. While it is true that Section 1274(b) itself says nothing to the contrary, the defendants' argument completely ignores controlling language elsewhere in the Act.

Each river area in the Wild and Scenic River System must be "administered in such manner as to protect and enhance the values which caused it to be included" in the System. 16 U.S.C. § 1281(a). The values which cause a river area to be included in the System are the "outstandingly remarkable ... values" of the river and of the related land adjacent to it.[3] Selecting detailed boundaries is an administrative act; it is an alteration of the river area already established by Congress.[4] As an administrative act, Section 1281(a) applied to the Park Service's selection of boundaries. Far from exercising complete discretion under that Section, the Park Service was required to make the boundary selection to protect and enhance the outstandingly remarkable values that caused the Niobrara River area to be included in the System.

Accordingly, we reject the defendants' contention that the Wild and Scenic Rivers Act provided no meaningful standard for the selection of detailed boundaries; this interpretation conflicts with the

---

[3] "A river area may be "caused to be included" in the System, for the purposes of Section 1281(a), only if it contains 'a free-flowing stream and related adjacent land area that possesses one or more of the values referred to in Section 1271 of this title.' 16 U.S.C. § 1273(b). Section 1271 provides in turn: '... certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved ... [and] they and their immediate environments shall be protected....' Thus, the 'values' referred to in Section 1281(a) are the 'outstandingly remarkable' values set out in Section 1271." *Sokol*, 210 F.3d at 878 n. 5.

[4] "Once a river area is included by Congress in the System, river-area boundaries are automatically established, on a provisional basis, one-quarter mile from the river's banks. 16 U.S.C. § 1275(d). An agency's selection of detailed boundaries does not bring the river area into existence; the river area exists before agency action." *Sokol*, 210 F.3d at 879 n. 6.

-5-

administrative duty clearly set out in Section 1281(a).... The defendants argue correctly that the Park Service was not required to include only land with outstandingly remarkable values. The Park Service's statutory duty was to establish detailed boundaries, within the acreage limits of Section 1274(b), that would protect and enhance the outstandingly remarkable values that caused the river area to be included in the Wild and Scenic Rivers System. This duty does not always bar the administering agency from including unremarkable land; indeed, the Act could require such inclusion where necessary to protect outstandingly remarkable resources, *e.g.* because of the need for buffer zones around resources or because of discontinuities in a resource's locations. Equally, the Act does not require that the boundaries encompass all the outstandingly remarkable resources; this might be impossible given the acreage limitation. Neither categorical alternative is required by our decision. The Act allows the administering agency discretion to decide which boundaries would best protect and enhance the outstandingly remarkable values in the river area, but it must identify and seek to protect those values, and not some broader category.

We also reject the defendants second argument—that the Park Service did, in fact, identify and seek to protect the outstandingly remarkable values of the Niobrara River area. As the defendants admit, the planning team consistently analyzed resources in the Niobrara for their "significance" and "importance." These terms are not synonymous with "outstandingly remarkable." Significance and importance are much broader terms....

The Park Service did not choose the terms "significance" and "importance" because they were synonyms for "outstandingly remarkable." These terms were derived from a separate legal standard used by Park Service officials to evaluate potential park lands, a standard with which they were more familiar than the Wild and Scenic River Act's outstandingly-remarkable-values standard....

The values identified by the Park Service for protection likewise demonstrate that the planning team confused the standards appropriate for choosing potential parks and for selecting boundaries under the Wild and Scenic Rivers Act.... The record provides no evidence that the

planning team later corrected its confusion, or that it assigned a special meaning to the terms "significance" and "importance," equivalent to the statutory terms. Mr. Conrod, the team captain, admitted no such conscious decision had ever occurred. Indeed, Mr. Conrod went so far as to express what almost amounted to contempt for the terms of the statute....

The defendants argue that whatever errors may have been made in the initial process were corrected in the draft and final boundary alternatives and in the Record of Decision. It is true that, after Mr. Sokol complained that the wrong standard was being used, editorial changes were made to the draft and final boundary alternatives. Specifically, a few sentences were added noting that "significant" and "important" were to be understood to mean outstandingly remarkable. These *post hoc* re-definitions, however, were not sufficient to correct past errors upon which the boundary alternatives and Record of Decision were based....

... Even after the Record of Decision had been published, Mr. Conrod stated that the outstandingly-remarkable-values standard did not apply to the selection of boundaries, but applied only initially "in the context of consideration of new sites." The Park Service analyzed the river area under the wrong standard, failing to use the outstandingly-remarkable-values standard required by the Act in selecting boundaries; it failed to correct its initial mistakes.

*Id.* at 878-81 (footnotes and internal references omitted).

The Court of Appeals also found "evidence in the record to suggest that the Park Service was not selecting land to protect the river area's resources but simply to maximize the number of acres included in the system." *Id.* at 881 n. 11 (citing draft boundary alternative memorandum which stated that "preferred boundary alternative includes 'maximum statutory acreage,' compared with others which include only 'critical resources.'")."Particularly troubling," the Court stated, "was the decision to include more than 10,000 acres of 'hypothetical' viewshed, land that a canoeist on the river would see if one assumed that there were no trees or foliage along the banks. This was a massively counterfactual assumption; the Park Service knew that 60 to 70

per cent. of the Niobrara River is screened by dense trees and foliage. Much of the land included in this viewshed was ordinary, unstriking, and apparently unnecessary to protect the scenic values of the river. The Park Service may include only land which possesses outstandingly remarkable resources or which is actually necessary to protect such resources." *Id.* (internal references omitted).

Finding that the Park Service's boundary selection was not in accordance with law, the Eighth Circuit reversed and remanded to the district court with instructions to remand to the Park Service. The Court directed that "[o]n remand, the Park Service should select boundaries that seek to protect and enhance the outstandingly remarkable values of the Niobrara Scenic River Area." *Id.* at 881.

### D. Post-Sokol Administrative Action

The redrawing of boundary lines was completed in 2007. The Final General Management Plan ("GMP") and Environmental Impact Statement ("EIS") describe three alternative boundaries and three alternative management plans that were considered by NPS, along with a description of the process the agency conducted in developing these alternatives. On March 26, 2007, NPS Regional Director, Ernest Quintana, approved the Record of Decision choosing Management Alternative B and Boundary Alternative 3 on the recommendation of Paul Hedren, who at the time was NPS Superintendent of the Niobrara National Scenic River.

### E. Simmons' Lawsuit

The present action was commenced on March 25, 2013, with the filing of a two-count complaint. It is stated that "Simmons is a property owner who has a working ranch and operates a recreational outfitter business, which includes canoeing and lodging, on land adjacent to the Niobrara Scenic River in Cherry County, Nebraska" (Filing No. 1 at CM/ECF p. 3). Simmons generally alleges that "NPS has acted

-8-

improperly and contrary to law with respect to establishment of boundaries and management of the Niobrara Scenic River" (Filing No. 1 at CM/ECF p. 3).

Count I of the complaint is brought under the Declaratory Judgment Act , and it is alleged that a case of actual controversy exists between Simmons and NPS pursuant to 28 U.S.C. § 2201 concerning NPS's failure:

> (a) to exercise its statutory duty to administer the Niobrara Scenic River by establishing detailed boundaries for the Niobrara Scenic River "in such manner as to protect and enhance the [outstandingly remarkable values ("ORV's")] which caused it to be included" in the WSR Act. *Sokol*, 210 F.3d at 878; *Friends*, 348 F. 3d at 798 (hereinafter failure relating to "establishing detailed boundaries");

> (b) in adopting a Final CMP [comprehensive management plan] that, while associating specific ORV's with Niobrara Scenic River corridor in a general fashion, does not reflect the precise location of the ORV's or how, in drawing the boundaries for Simmons, NPS sought to protect them, including the fact the Record of Decision reflects some ORV's are not protected by the present boundaries and, indeed, that not all ORV's have been fully located. *Friends*, 348 F. 3d at 798 (hereinafter failure to identify "precise location of ORV's on Simmons property");

> (c) to provide any "concrete measure of use" or otherwise "sufficiently address 'user capacities'" pursuant to Section 1274(d)(1) of the WSR Act on the basis the VERP [Visitor Experience and Resource Protection] be "implemented through the adoption of quantitative measures sufficient to ensure its effectiveness as a current measure of user capacities" (and NPS'[s] further failure in the interim to "implement preliminary or temporary limits of some kind") as opposed to merely creating a "VERP framework… contain[ing] only sample standards and indicators" as was done in the Final CMP [comprehensive management plan (also referred to as the Final General Management Plan and Environmental Impact Statement)] by NPS for the Niobrara Scenic River. *Friends*, 348 F. 3d at 796-97 (hereinafter failure to "address user capacities"); and

(d) in creating insufficient procedures in a "comprehensive fire management plan" identified in the Final CMP in an effort to meet the requirements that it manage the Niobrara Scenic River corridor "in such manner as to protect" the ORV's (hereinafter failure relating to "comprehensive fire management plan").

(Filing No. 1, ¶ 35.)  The court is requested to enter an order "declaring the right of Simmons to require NPS (a) to exercise its statutory duty to administer the Niobrara Scenic River by properly establishing detailed boundaries; (b) to identify the precise location of ORV's on Simmons property; (c) to properly address user capacities; and (d) to create sufficient procedures in a comprehensive fire management plan." (Filing No. 1, ¶ 36.)

Count II of the complaint is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 et seq., and it is alleged that NPS violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq.  The court is requested to enter an order:

(a) Declaring the right of Simmons to require NPS (a) to exercise its statutory duty to administer the Niobrara Scenic River by establishing new detailed boundaries for the Niobrara Scenic River "in such manner as to protect and enhance the [ORV's] which caused it to be included" in the WSR Act; (b) to adopt and implement a new comprehensive management plan that reflects the precise location of all ORV's on Simmons property on the Niobrara Scenic River and how, in drawing the boundaries, the NPS sought to protect them; and (c) to provide in a revised Final CMP a "concrete measure of use" or otherwise "sufficiently address 'user capacities'" as required by Section 1274(d)(1) of the WSR Act (including implementation of reasonable interim "preliminary or temporary limits of some kind") that would provide certainty to Simmons in his outfitter business while at the same time provide the "recreational enhancements … envisioned" by the WSR Act acknowledged by NPS (Final CMP at 229); and (d) to manage the Niobrara Scenic River corridor "in such manner as to protect" the ORV's by creating sufficient procedures in a "comprehensive fire management

-10-

plan" to be included in a new Final CMP in accordance with 16 U.S.C. § 1281(a).

(b) Entering a mandatory injunction compelling NPS to exercise its statutory duty to administer the Niobrara Scenic River by establishing new detailed boundaries for the Niobrara Scenic River "in such manner as to protect and enhance the [ORV's] which caused it to be included" in the WSR Act; (b) to adopt and implement a new comprehensive management plan that reflects the precise location of all ORV's on Simmons property on the Niobrara Scenic River and how, in drawing the boundaries, the NPS sought to protect them; (c) to provide in a revised Final CMP a "concrete measure of use" or otherwise "sufficiently address 'user capacities'" as required by Section 1274(d)(1) of the WSR Act (including implementation of reasonable interim "preliminary or temporary limits of some kind") that would provide certainty to Simmons in his outfitter business while at the same time provide the "recreational enhancements … envisioned" by the WSR Act acknowledged by NPS (Final CMP at 229); and (d) to manage the Niobrara Scenic River Corridor "in such manner as to protect" the ORV's by creating sufficient procedures in a "comprehensive fire management plan" to be included in a new Final CMP in accordance with 16 U.S.C. § 1281(a).

(c) Ordering recovery to Simmons of his costs, attorney fees and expenses to the extent allowed by law pursuant to 28 U.S.C. § 2412; and

(d) Providing such other or further relief to Simmons as the Court finds just or equitable or allowed by the pleadings.

(Filing No. 1 at CM/ECF p. 16-17.)

Defendants answered the complaint on July 15, 2013 (Filing No. 14). On September 5, 2013, Defendants filed the administrative record ("AR") for the 2007 General Management Plan and the associated Environmental Impact Statement for the Niobrara National Scenic River, Nebraska (Filing No. 24). The administrative record was supplemented on January 31, 2014 (Filing Nos. 37, 38).

-11-

On January 17, 2014, Defendants filed a motion to dismiss for lack of jurisdiction any claim regarding the decision of record as it applies to any landowner other than Simmons (Filing No. 32). Simmons responded to the motion by stating that he "does not seek to have any boundaries redrawn other than his own" (Filing No. 39 at CM/ECF p. 14). Based on that representation, the court denied the motion to dismiss without prejudice and indicated it would "review NPS's actions only insofar as they directly affect the plaintiff's property" (Filing No. 45 at CM/ECF p. 23).

Defendants' January 17th motion also requested a protective order to prevent any discovery (Filing No. 32). Simmons responded that discovery was warranted to investigate "the apparent bias of NPS officials [Stuart] Schneider and [Paul] Hedren against Simmons, and whether such bias caused the NPS to draw boundaries of the Niobrara Scenic River at least in part based on who owned the land, not on the ORVs associated with the land" (Filing No. 39 at CM/ECF p. 20). The court, after finding that Simmons had made a "sufficient showing to depose Hedren and Schneider and other persons who have knowledge concerning the placement of the boundary lines on Simmons' property," allowed Simmons "to take up to 5 depositions for the limited purpose of obtaining evidence that NPS officials acted in bad faith," and also authorized the defendants to "depose Simmons about his proposed testimony 'regarding how he was treated'" (Filing No. 45 at CM/ECF p. 23). The court then established a progression schedule which provided for the completion of depositions by December 1, 2014, and the filing of motions for summary judgment by March 2, 2015 (Filing No. 48). These deadlines were subsequently extended until May 7 and July 2, 2015, respectively (Filing Nos. 53, 55, 61, 63 (text orders)).

On April 14, 2014, Simmons filed a motion to complete or supplement the administrative record by including (1) Geographic Information System (GIS) files or other electronically stored information that were used to identify the location of ORVs on the Niobrara and (2) NPS emails, computer files and other documents relating to property owned or managed by Simmons or his family along the Niobrara between 2002 and March 26, 2007 (Filing No. 65). The motion was granted in part on

September 1, 2015, with the court directing Defendants to produce certain records and to identify individuals to be deposed regarding these matters; however, the administrative record was not enlarged. The court's order stated that "[a]bsent any threshold showing of bad faith or bias and/or that the administrative record is incomplete or needs to be supplemented, this case shall be resolved wholly on review of the administrative record" (Filing No. 92). A new schedule for summary judgment motions was established, and subsequently extended, which required Simmons to file a brief by January 11, 2016, Defendants to file a brief by February 10, 2016, and Simmons to file a reply brief by March 3, 2016 (Filing Nos. 92, 95 (text order)).

On January 11, 2016, Simmons filed a motion to complete or supplement the administrative record with deposition testimony and exhibits, plus certain maps which show boundary lines of Simmons' property (Filing No. 102). The motion is supported by a brief (Filing No. 103) and an index of evidence (Filing No. 104). In addition, Simmons filed a motion for summary judgment (Filing No. 105) with a supporting brief (Filing No. 111) on January 11, 2016. Simmons asks the court to:

A. Enter a declaratory judgment declaring:

(i) NPS failed to properly exercise its statutory duty in establishing detailed boundary for the Niobrara on [Simmons'] property in such manner only as to protect and enhance ORVs as required in *Sokol*;

(ii) NPS failed to reflect the precise location of ORVs on [Simmons'] property within the Niobrara boundary;

(iii) NPS shall within ninety (90) days of this Court's judgment redraw and re-designate a proper boundary on [Simmons'] property that, in light of the evidence, shall include only viewshed (scenic) ORVs specifically found by NPS within a quarter-mile of the Niobrara on [Simmons'] property.

-13-

B. Enter judgment finding and concluding NPS violated the APA and/or NEPA:

> (i) By NPS failing to properly exercise its statutory duty in establishing detailed boundary for the Niobrara on [Simmons'] property in such manner only as to protect and enhance ORVs as required in *Sokol*;

> (ii) By NPS failing to reflect the precise location of ORVs on [Simmons'] property within the Niobrara boundary;

> (iii) And order NPS within ninety (90) days of this Court's judgment to redraw and re-designate a proper boundary on [Simmons'] property that, in light of the evidence, shall include only viewshed (scenic) ORVs specifically found by NPS within a quarter-mile of the Niobrara on [Simmons'] property.

C. Enter an order providing [Simmons] the right to recover his costs, attorney fees and expenses under 28 U.S.C. § 2412 or otherwise under law; and

D. Enter an order granting other or further relief as the Court finds just or equitable or allowed by the pleadings.

(Filing No. 106 at CM/ECF p. 52.)[5]

On February 10, 2016, Defendants filed a motion for summary judgment (Filing No. 109), together with a consolidated brief in support of their motion, in opposition to Simmons' motion to complete or supplement the administrative record, and in opposition to Simmons' motion for summary judgment (Filing No. 111). Simmons filed a consolidated reply brief in support of his motion for summary judgment and his motion to complete or supplement the administrative record on March 3, 2016

---

[5] Simmons' motion for summary judgment does not address NPS's alleged failure to "address user capacities" or alleged failure relating to "comprehensive fire management plan," and such claims are deemed withdrawn.

-14-

(Filing No. 112), together with a supplemental index of evidence (Filing No. 113). On March 7, 2016, Simmons filed a reply brief in opposition to Defendants' motion for summary judgment (Filing No. 114).

On March 9, 2016, Defendants filed a motion requesting leave to file a sur-reply brief regarding Simmons' motion to complete or supplement the administrative record and a reply brief regarding their motion for summary judgment (Filing No. 116). A supporting brief was also filed (Filing No. 117). Simmons filed an opposing brief on March 21, 2016 (Filing No. 118).

## II. DISCUSSION

In the discussion which follows, the court will rule on Defendants' motion to file further briefs (Filing No. 116), Simmons' motion to complete or supplement the administrative record (Filing No. 102), and the parties' cross-motions for summary judgment (Filing Nos. 105, 109).

### A. Defendants' Motion to File Further Briefs

In their initial, 105-page brief, Defendants oppose Simmons' motion to complete or supplement the administrative record and object to Simmons making reference to the additional material in the brief filed in support of his motion for summary judgment. Defendants claim prejudice and complain that they have been "force[d] to respond to all of Plaintiff's additional non-record evidence in the merits of the summary judgment response, rather than having the Court determine whether any of such additional evidence should even be considered as a supplement to the Administrative Record" (Filing No. 111 at CM/ECF p. 69). Simmons replies that he "has stream-lined the process" and disputes that Defendants have been prejudiced (Filing No. 112 at CM/ECF pp. 2-5).

-15-

Defendants now want to file a sur-reply brief to respond to Simmons' "stream-lining" argument and to address Simmons' arguments that omitted NPS emails and certain deposition testimony and exhibits support his "bad faith" claim. Defendants also want to reply regarding the additional exhibits that were filed on March 3, 2016.

Under the circumstances, the court does not fault Simmons for referencing non-record evidence in his brief, nor does it find Defendants have been prejudiced. The briefing schedule that was established on September 1, 2015 (Filing No. 92), and extended on September 10, 2015 (Filing No. 95 (text order)), did not provide for Defendants to file a reply brief regarding their motion for summary judgment. The court does not believe the topics identified by Defendants require further discussion. Accordingly, Defendants' motion to file further briefs (Filing No. 116) will be denied.

### B. Simmons' Motion to Complete or Supplement Administrative Record

"It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision." *Rochling v. Department of Veterans Affairs*, 725 F.3d 927, 936 (8th Cir. 2013) (quoting *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004)). "By confining judicial review to the administrative record, the APA precludes the reviewing court from conducting a de novo trial and substituting its opinion for that of the agency." *Id.* (quoting *Voyageurs Nat'l Park Ass'n*, 381 F.3d at 766).

"The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "When reviewing agency decisions, both a district court and an appellate court must make an independent decision based on the identical record that was before the fact finder." *Wilkins v. Secretary of Interior*, 995 F.2d 850, 853 (8th Cir. 1993). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the

-16-

agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

Certain exceptions have been carved from the general rule limiting APA review to the administrative record. District courts are "permitted to admit extra-record evidence (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) if the agency has relied on documents not in the record; (3) when supplementing the record is necessary to explain technical terms or complex subject matter or (4) when the plaintiff makes a showing of agency bad faith." *Rochling v. Dep't of Veterans Affairs*, No. 8:10CV302, 2011 WL 5523556 at *3 (D.Neb. Sept. 27, 2011) (citing *The Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)). "These exceptions apply only under extraordinary circumstances, and are not to be casually invoked unless the party seeking to depart from the record can make a strong showing that the specific extra-record material falls within one of the limited exceptions." *Id.* (quoting *Voyageurs Nat. Park Ass'n.*, 381 F.3d at 766).

"When there is a contemporaneous administrative record and no need for additional explanation of the agency decision, there must be a strong showing of bad faith or improper behavior before the reviewing court may permit discovery and evidentiary supplementation of the administrative record." *Voyageurs Nat. Park Ass'n.*, 381 F.3d at 766 (internal quotations omitted). "[T]o put facts relating to bad faith in play a plaintiff must first make a threshold showing of either a motivation for the Government employee in question to have acted in bad faith or conduct that is hard to explain absent bad faith.'" *Tech Sys., Inc. v. United States*, 97 Fed. Cl. 262, 265 (2011) (citation omitted) (quoting *Beta Analytics Intern., Inc. v. United States*, 61 Fed. Cl. 223 (2004). "Second, the plaintiff must persuade the Court that discovery could lead to evidence which would provide the level of proof required to overcome the presumption of regularity and good faith." *Beta Analytics*, 61 Fed. Cl. at 226.

-17-

"The burden of proof required for supplementing the administrative record is lower than that required for demonstrating bad faith or bias on the merits." *Pitney Bowes Government Solutions, Inc. v. United States*, 93 Fed.Cl. 327, 332 (2010). "The test for supplementation is whether there are sufficient well-grounded allegations of bias to support an inquiry and supplementation; the protesting plaintiff need not make a showing of clear and convincing evidence of bias on the merits." *Id.* (citing *L-3 Communications Integrated Systems, L.P. v. United States*, 91 Fed.Cl. 347, 354 (2010)). "Consistent with this standard, ... trial courts have [only] required a plaintiff to assert a reasonable factual predicate for such allegation." *Id.* (quoting *L-3 Communications*, 91 Fed.Cl. at 355).

Defendants object to Simmons' proposed expansion of the administrative record, except that they "do not oppose the introduction the maps and supporting documents provided by [Simmons'] expert surveyor, Mr. Neef" (Filing No. 111 at CM/ECF p. 71). The court previously found that "Simmons ha[d] made a sufficient showing to depose ... persons who have knowledge concerning the placement of the boundary lines on Simmons's property ... for the limited purpose of obtaining evidence that NPS officials acted in bad faith" (Filing No. 45 at CM/ECF p. 23). The court also ordered Defendants to produce 20 emails that referenced "Simmons" and certain additional records (Filing No. 92 at CM/ECF pp. 11-12), which were later marked as deposition exhibits. The court will grant Simmons' motion (Filing No. 102) and will consider the exhibits that were filed by him on January 11, 2016 (Filing No. 104), and March 3, 2016 (Filing No. 113), together with the exhibits that were filed by Defendants on February 10, 2016 (Filing No. 110).

## C. Parties' Cross-Motions for Summary Judgment

Simmons alleges that NPS's final record of decision on the 2007 General Management Plan and the associated Environmental Impact Statement for the Niobrara National Scenic River violated NEPA. "While NEPA does not authorize a private right of action, the Administrative Procedure Act (APA) permits judicial

review of whether an agency's action complied with NEPA." *Friends of Norbeck v. United States Forest Service*, 661 F.3d 969, 973 (8th Cir. 2011). "NEPA's purpose is to ensure a fully informed and well considered decision, and disclosure to the public that the agency has considered environmental concerns in decision making." *Id.* (citation omitted). "As such, NEPA's mandate is 'essentially procedural' and its rules do not govern the substance of the decision itself." *Id.* at 974 (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).

Under the APA, an agency action shall not be set aside unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court's scope of review is narrow, and the court may not substitute its judgment for that of the agency. *See Niobrara River Ranch, L.L.C., v. Huber*, 373 F.3d 881, 884 (8th Cir. 2004). "However, an agency must provide a satisfactory explanation for its actions based on relevant data." *Id.* The court's review "is limited to determining whether a challenged agency decision considered 'the relevant factors' and whether an agency has committed 'a clear error of judgment.' *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

"Arbitrary and capricious" review is "highly deferential" and "presumes the agency's action to be valid." *Envt'l. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C.Cir. 1981). "[T]he court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C. 1995) (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)). "Although nothing more than a brief statement is necessary, the core requirement is that the agency explain why it chose to do what it did." *Tourus Records, Inc. v. Drug*, 259 F.3d 731, 737 (D.C.Cir. 2001) (internal quotations and citation omitted).

"Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record." *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014), *aff'd sub nom. Fulbright v. Murphy*, No. 14-5277, 2016 WL 3040524 (D.C. Cir. Apr. 29, 2016). However, "the standard set forth in Rule 56(a) does not apply because of the court's limited role in reviewing the administrative record." *Id.* (quoting *Coe v. McHugh*, 968 F.Supp.2d 237, 239 (D.D.C. 2013)).

Simmons argues that "NPS'[s] decisions during the boundary selection process to increase an initial, interim boundary on Simmons' property were based on impermissible grounds, including NPS'[s]: (1) assumption that the entire 150,000 acres in the Niobrara corridor 'rim to rim' included ORVs (which assumption was at odds with *Sokol*'s observation 60 to 70 percent of such land was 'ordinary' and 'unstriking'); (2) desire to reach a certain number of total acres (23,074) of ORVs for the Niobrara; (3) motivation to use the boundary selection process to prevent Simmons from developing a dam on his property; and (4) interest in rewarding another landowner (Krueger) for being more 'open' and supportive of NPS in the Niobrara area (Filing No. 106 at CM/ECF p. 3). He also claims the new evidence gathered through discovery "confirms Hedren had longstanding animus toward Simmons and acted in bad faith when increasing the boundary on Simmons' property" (Filing No. 106 at CM/ECF p. 3).

### 1. "Rim-to-Rim" Outstandingly Remarkable Values

On remand from the Eighth Circuit's *Sokol* decision, NPS determined that five of the seven Congressionally-identified ORVs were present and worthy of protection at the Niobrara River: (1) the Scenic Value (AR_8136-8137, 8139-8140); (2) the Recreational Value (AR_8138, 8143-8144); (3) the Geologic Value (AR_8141), (4) the Fish and Wildlife Value (AR_8145-8146); and (5) the Paleontological Value under the "Other Category" Value of the WSRA (AR_8147-8150). NPS determined

-20-

the Scenic, Geologic, and Fish and Wildlife ORVs were present throughout the Niobrara Valley, rim-to-rim, covering 150,000 acres (AR_8136, 8141, 8145-8146).

NPS prepared three separate and distinct Boundary Alternatives (AR_8148, 8151, 8153-8158). Boundary Alternative 1 is the provisional boundary established by the WSRA, which was set one-quarter mile back on each side of the river from the ordinary high water mark (AR_8148, 8153-8154, 9076). Boundary Alternatives 2 and 3 represent adjustments to the provisional boundary that were intended to protect and enhance the ORVs. (AR_8148, 8151, 8155-8158). In particular, NPS made Boundary Alternative 3 wider between the Fort Niobrara National Wildlife Refuge and Norden Bridge "[d]ue to the complexity of the intertwined biological resources comprising the Scenic, Geologic, and Fish and Wildlife values. . . ." (AR_8151). Simmons' land is within this area (Filing 104-26, Neef Decl. ¶¶ 5, 8, Exs. D, G (sealed)).[6] NPS also

---

[6] The record shows that Simmons' property also contains Recreational Value and borders property containing Paleontological Value:

> A review of the Neef maps indicates several ORVs on Plaintiff's property. Exhibit D is based on a Cornell Dam quadrant map found at AR_4511. The preferred boundary line (green line) contains some of Plaintiff's land. (Filing 104-26, Neef Decl. ¶ 5, Ex. D (sealed)). Most of Plaintiff's land within the preferred boundary is within the Niobrara River Viewshed (red line, Recreational ORV) (Filing 104-26, Neef Decl. ¶ 5, Ex. D (sealed)). The preferred boundary also encompasses two regionally-significant fossil sites located just north of Plaintiff's land (represented by red triangles, Paleontological ORV). (Filing 104-26, Neef Decl. ¶ 5, Ex. D (sealed)).

> Exhibits E, F and G are based in the Sparks Quadrant maps found in the Administrative Record. (AR_4512, 4513, 4492). These maps identify several ORVs within Plaintiff's property. South of the River, Plaintiff's property includes Viewshed (red line, Recreational ORV), foliage (green shading, Scenic ORV), and waterfalls (yellow squares, Geologic and Scenic ORV's). North of the River, Plaintiff's property includes Viewshed (red line, Recreational ORV) and foliage (green

increased the boundary in areas it considered more susceptible to development (AR_8125, 8137). NPS preferred, and eventually selected, Boundary Alternative 3, stating that it "equally protects the River's outstandingly remarkable scenic, recreational, geologic, fish and wildlife, and paleontological values within its 23,074 acres" (AR_9076, 9096).

NPS defends its "conclusion that three ORVS exist from rim-to-rim, encompassing 150,000 acres," by stating:

> The Scenic Value is supported by the six continental ecosystems that prosper and mix in the Niobrara River corridor, including but not limited to the ponderosa pine forest and savanna, and a Rocky Mountain vegetative stand located on the eastern edge. (AR_8136-8137, 8339-8340). The multifaceted geology of the Niobrara River supports and is linked inextricably to the rich vegetation and diverse fish and wildlife, and the wonderous [sic] array of waterfalls and remarkable paleontological resources. (AR_8141). The Fish and Wildlife Value is justified by the Niobrara Valley's support of nationally or regionally important populations of indigenous wildlife species, including populations of threatened, endangered, or sensitive species, including bald eagles, a sensitive species. (AR_8196-8199, 8341-8342). Further, the Niobrara River provides an exceptional habitat for the diverse species, and the convergence of the six ecosystems has supported both an east-west avian corridor for birds, and hybridization of several species. (AR_8145-8146). The largely natural condition of the valley makes the Niobrara River, from rim-to-rim, a unique wonder in the Great Plains and beyond.

(Filing No. 111 at CM/ECF p. 87.)

---

shading, Scenic ORV). (Filing 104-26, Neef Decl. ¶¶ 6-8, Exs. E, F, G (sealed), see map legends).

(Filing No. 111 at CM/ECF p 36 (footnote omitted)).

-22-

Simmons contends this finding of "rim-to-rim" ORVs is inconsistent with the Eighth Circuit's footnoted comment in *Sokol* that "60 to 70 percent of the Niobrara River is screened by dense trees and foliage . . . [with] [m]uch of the land included in the viewshed . . . ordinary, unstriking, and apparently unnecessary to protect the scenic values of the river." 210 F.3d at 881 n. 11. That comment, however, was directed at NPS's "decision to include more than 10,000 acres of 'hypothetical' viewshed, land that a canoeist on the river would see if one assumed that there were no trees or foliage along the banks." *Id.* No such "hypothetical" viewshed was used by NPS on remand.

Instead, "[v]iewshed lines were drawn by NPS personnel who canoed the entire Niobrara River to map the viewshed. (AR_9105). Rangers also mapped the overlook viewsheds. (AR_8331, ¶ 43). 'Distance detail was drawn on topographic maps and often ground-truthed and plotted with global positioning equipment.' *Id.*" (Filing No. 111 at CM/ECF p. 9, ¶ 23). "The Recreational ORV maps in the Final GMP include two types of viewsheds: (1) the River Viewshed (represented by the area between red lines on either side of the river); and (2) the Overlook and Bridge Viewsheds (represented by various colored polygons) (AR_8143-8144)" (Filing No. 111 at CM/ECF p. 9, ¶ 23). As NPS further explains, it

> redrew the River Viewshed line to respond to the *Sokol* holding that 60 to 70 percent of the prior viewshed was not visible from the River. In 2000, Mr. Hedren advised the Niobrara Council that the NPS was going to map the actual "view shed" specifically to respond to the Court's ruling. Filing 110-4, Hedren Depo. 222:6-11; Filing 110-10, Ex. I, Depo. Ex. 18, p. 4. The NPS rangers drew new viewshed lines by canoeing the river, continually scanning the landscape, and documenting the details on topographic maps. (AR_8331, ¶ 43). The resulting River Viewshed was an essential component of the Recreational ORV and was included on maps in the GMP. (AR_8138, 8143-8144).

(Filing No. 111 at CM/ECF pp. 86-87.)

-23-

### *2. Maximizing Acreage*

Simmons accuses NPS of also disobeying the Eighth Circuit's directive that it should not select boundaries "simply to maximize the number of acres included in the system." 210 F.3d at 881 n. 11. In particular, he complains that on January 10, 2003, the boundary line on his property was redrawn to compensate for a "substantial portion" of 25 acres that were removed from a neighboring property owned by Kerry Krueger (see Filing No. 106 at CM/ECF pp. 21-25, ¶¶ 47-54). NPS does not dispute that the boundary line was moved for this reason (see Filing No. 111 at CM/ECF pp. 52-56), and its Superintendent, Paul Hedren, so testified (see Filing No. 104-4 at CM/ECF pp. 53-54).[7] NPS also admits making "a conscious decision to keep the number of acres contained within Boundary Alternative 3 constant after revealing the boundary alternatives to the public" (Filing No. 111 at CM/ECF p. 55). Hedren "wanted consistency" and "did not want to go to the public ... [saying] it measured thus and so ... and then the next time the measurement was different" (Filing No. 110-4 at CM/ECF p. 188). Absent any showing that the boundary change was made for the purpose of protecting and enhancing the outstandingly remarkable values of the Niobrara Scenic River Area, as opposed to maintaining the Area's acreage at a certain number,[8] the court finds that NPS's action was arbitrary and capricious.

### *3. Dam Prevention*

Simmons charges that "Hedren made a final decision to dramatically increase the boundary on Simmons' property on January 9, 2003, even though he was fully aware he and NPS had not identified any ORVs on Simmons' property beyond the

---

[7] While the court does not find that Hedren acted in bad faith or was unduly biased against Simmons, it is not required to disregard his deposition testimony or other supplemental evidence.

[8] Even though Boundary Alternative 3's area of 23,074 acres is less than the statutory maximum of 24,320 acres, this does not justify the boundary change.

-24-

quarter-mile boundary" (Filing No. 114 at CM/ECF p. 16). Simmons speculates that Hedren made this decision, at least in part, because he wanted to prevent Simmons from constructing a dam on his property (see Filing No. 106 at CM/ECF pp. 17-19, ¶¶ 35-42). Suffice it to say the evidence does not support this claim.

While there is evidence that the Corps of Engineers, on May 23, 2003, denied Simmons a permit to build a dam within 400 feet of the river, there is no evidence to indicate that NPS extended the boundaries to prevent Simmons from building a dam more than a one-quarter of a mile from the river. Indeed, all of the evidence is to the contrary—that the dam permit process had no effect on the boundary decisions (see Filing No. 111 at CM/ECF pp. 47-48). Simmons argues that an adverse inference should be drawn from the fact that certain documents were not included in the administrative record (see Filing No. 106 at CM/ECF pp. 34-35 (¶¶ 76-80), 50-51), but after carefully reviewing the documents identified by Simmons (Filing Nos. 104-20, 104-21, 104-22, 104-23) and NPS's response (see Filing No. 111 at CM/ECF pp. 62-65),  the court is satisfied that NPS did not have adequate notice that documents pertaining to the dam permit process were relevant to the pending action. The court also declines to draw an adverse inference regarding any documents that were withheld prior to or during a Rule 30(b)(6) deposition.

### 4. Differential Treatment

Simmons argues that "NPS'[s] action toward [him] was arbitrary and capricious —regardless of NPS'[s] motivation or absence of bad faith—because NPS treated Simmons differently than similarly situated parties, *e.g.*, Krueger, in the Niobrara boundary selection process" (Filing No. 106 at CM/ECF p. 48). Because Simmons relies entirely upon NPS's decision to exclude 25 acres of Krueger's property from Boundary Alternative 3, and then to move the boundary line further into Simmons' property to make up the difference, the court need not consider Simmons' differential treatment claim. The court has already determined, based on NPS's admissions, that such boundary change on Simmons' property was arbitrary and capricious.

### 5. Bad Faith

Finally, Simmons claims that "Hedren's subjective bad faith and animus toward Simmons—ratified by NPS through acquiescence—deprived Simmons of fair and honest consideration of the Niobrara boundary to be placed on his property" (Filing No. 106 at CM/ECF p. 49). Stating that Hedren "strongly opposed Simmons building a dam on his property" Simmons claims that "NPS improperly used ... the boundary designation process to ensure Simmons would be blocked from building future dams" (Filing No. 106 at CM/ECF p. 49). As previously discussed, the evidence does not support this claim. Simmons additionally claims Hedren was concerned that Simmons would gain control of additional riverside property from his brother Carl (see Filing No. 106 at CM/ECF pp. 14-17, ¶¶ 29-33), and moved the boundary line in anticipation of this happening. This also is unfounded speculation. While the court permitted Simmons to conduct discovery to develop his bad faith claims, they are not borne out by the evidence.

### D. Declaratory Judgment

Defendants argue that Simmons' request for declaratory and injunctive relief "is contrary to law in an administrative case" and that "[s]hould the Court determine the NPS action to be unlawful, ... the appropriate remedy would be a remand to the agency because the agency is in the best position to evaluate the administrative record documents, along with evidence submitted by Plaintiff" (Filing No. 111 at CM/ECF pp. 101-02). The court agrees, although it does not believe any further evaluation will be necessary regarding the January 10, 2003 boundary change. *See Ramirez-Peyro v. Gonzales*, 477 F.3d 637, 641 (8th Cir. 2007) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.") (quoting *INS v. Ventura*, 537 U.S. 12, 16 (2002)); *Palavra v. I.N.S.*, 287 F.3d 690, 693 (8th Cir. 2002) ("If ... an agency decides a case on a ground believed by an appellate court to be wrong, the case has to be remanded to the agency."). *Cf. Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885,

901 (8th Cir. 2013) ("An administrative remand may be appropriate when an agency procedurally errs by failing to articulate a reasoned basis for its decision. When an agency legally errs by acting outside its statutory authority, a remand would be futile and improper."). Accordingly, this matter will be remanded to NPS with directions to remove from the Niobrara Scenic River area that portion of Simmons' property that was added to the area by reason of changing Boundary Alternative 3 on January 10, 2003 (see AR__004492, referencing "add on 25 acres here").

IT IS ORDERED:

1.     Defendants' motion for leave to file further briefs (Filing No. 116) is denied.

2.     Plaintiff's motion to complete or supplement the administrative record (Filing No. 102) is granted.

3.     Plaintiff's motion for summary judgment (Filing No. 105) is granted in part and denied in part, as follows:

   a.     The motion is granted to the extent Plaintiff claims the National Park Service acted arbitrarily and capriciously by changing a boundary line on January 10, 2003.

   b.     In all other respects, the motion is denied.

4.     Defendants' motion for summary judgment (Filing No. 109) is granted in part and denied in part, as follows:

   a.     The motion is denied insofar as the January 10, 2003 boundary change is concerned, as to which claim Plaintiff has prevailed.

-27-

b.      In all other respects, the motion is granted and Plaintiff's other claims are dismissed with prejudice.

5.      Judgment shall be entered by separate document, generally providing that this matter is remanded to the National Park Service with directions to remove from the Niobrara Scenic River area that portion of Plaintiff's property that was added to the area by changing Boundary Alternative 3 on January 10, 2003.

DATED this 12th day of September, 2016.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge